# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**KYLIE OSSEGE**, *an individual,*

      Plaintiff,

v.

**OXFORD COMMUNITY SCHOOL DISTRICT**, *a municipal corporation*; **TIMOTHY THRONE**, *former Superintendent*; **STEVEN WOLF**, *Principal*; **NICHOLAS EJAK**, *Dean of Students*; **SHAWN HOPKINS**, *Counselor*;

      Defendants.

Case No: 22-cv
Hon.
Mag.

---

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com

---

**There are four possible companion cases currently pending before the Court which arise out of the same transaction or occurrence:**

**2:22-cv-11113-MAG-APP (filed 05/22/2022)**

**2:22-cv-10805-MAG-APP (filed 04/14/2022)**

**2:22-cv-10407-MAG-APP (filed 02/24/2022)**

**2:21-cv-12871-MAG-APP (filed 12/09/2021)**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kylie Ossege, by and through her attorneys, Deborah Gordon Law, states the following for her Complaint against the above-named Defendants:

### JURISDICTION & VENUE

1.      This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and under the statutes and common law of the State of Michigan.

2.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

3.      This Court should exercise supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy and arise from the same set of facts.

4.      Venue is proper, pursuant to 28 U.S.C. § 1391, because all the events giving rise to the claims occurred within this judicial district and because all Defendants reside within this judicial district.

5.      The amount in controversy in this matter exceeds $75,000.

## THE PARTIES

6.     Plaintiff Kylie Ossege is a recent graduate of Oxford High School. She resides in Oakland County, Michigan. At the time of November 30, 2021 shooting, Plaintiff was a 17-year-old high school senior.

7.     Defendant Oxford Community School District ("OCSD") is a municipal corporation organized in Oxford, Michigan. OCSD operates the public schools in Oxford, Michigan, including Oxford High School. OCSD controls Oxford High School's funding, training, staffing, staff supervision, and is responsible for the safety and security of the students.

8.     Defendant Timothy Throne was, at all times relevant herein, Superintendent of OCSD.

9.     Defendant Steven Wolf was, at all times relevant herein, the Principal of Oxford High School.

10.     Defendant Nicholas Ejak was, at all times relevant herein, Dean of Students at Oxford High School.

11.     Defendant Shawn Hopkins was, at all times relevant herein, a guidance counselor at Oxford High School.

## STATEMENT OF FACTS

12.     This case arises out of the deadliest school shooting in Michigan history.

13.     On November 30, 2021, a 15-year-old Oxford High School sophomore ("EC") entered the school building with a gun in his backpack, and subsequently opened fire in the school, injuring seven people and killing four students.

14.     Plaintiff sustained a "through and through" gunshot wound to the right shoulder during the shooting.

15.     In the months before the shooting, EC was known to OCSD staff, teachers, and administrators as a student with mental health issues.

16.     EC's behavior indicated that he was experiencing psychiatric distress, suicidality, and possible child abuse or neglect.

17.     At some time prior to the November 30th shooting, EC made several threatening posts to his publicly accessible social media accounts including countdowns, and threats of bodily harm and death.

18.     In early November 2021, Defendant Hopkins, EC's assigned guidance counselor, received an email from EC's teacher stating that EC seemed "sad."

19.     In the weeks preceding the November 30th shooting, OCSD administrators, including Throne and Wolf, received several reports from parents and students of violent threats directed towards the district and/or students in the district. Specifically, against Oxford High School and its students.

20.     On November 11, 2021, EC brought the severed head of a bird to school and placed it in the boys' bathroom.

21.     Students discovered the severed bird's head in the bathroom reported it to Wolf.

22.     Neither Wolf, nor anyone from the OCSD administration, informed parents or students of the incident.

23.     A reasonable investigation would have revealed that EC was responsible for the incident.

24.     EC recorded himself decapitating the bird and saved the video to his cell phone. He also wrote about the decapitation in his journal.

25.     On November 12, 2021, Oxford High School administration sent an email to students and parents stating "[p]lease know that we have reviewed every concern shared with us and investigated all information provided….The safety and security of our students and staff is always our top priority. To accomplish this task, OHS has numerous highly-trained professionals who work to keep our building safe and secure."

26.     On or around November 16, 2021, multiple parents contacted Wolf directly with their concerns about threats to students being made on social media.

27.     Parents also contacted Wolf directly regarding their concerns about multiple severed animal heads at Oxford High School.

28.     One parent wrote to Wolf stating "I know its been investigated but my kid doesn't feel safe at school…He didn't even want to go back to school today."

29.     OSCD administrators, including Throne and Wolf, ignored and dismissed the reports of threats against Oxford High School and its students.

30.     On November 16, 2021, Wolf sent an email to parents and students stating "I know I'm being redundant here, but there is absolutely no threat at the HS…large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors."

31.     The same day—November 16th—Throne made an announcement on the Oxford High School loudspeaker instructing students to stop spreading and relying on information obtained from social media. Throne reiterated that there was no threat to Oxford High School students.

32.     On November 26, 2021, EC's father gifted him a Sig Saur 9mm semi-automatic handgun.

33.     The same day, EC posted a picture of the gun on his publicly accessible social media account with the caption "just got my new beauty today [heart eyes emoji] Sig Saur 9 mm. Any questions I will answer."

34.     OSCD students, parents, and Defendants were able to view EC's post.

35.     On November 27, 2021, EC's mother posted a picture of a target from a shooting range on her publicly accessible social media account. Referring to the handgun purchase, the caption stated, "mom and son day testing out his new Christmas present."

36.     On the morning of November 29, 2021, teacher Jacquelyn Kubina discovered that EC was using his cell phone in class to research ammunition for firearms.

37.     Kubina reported the incident via email to Ejak and the school's Restorative Practice Coordinator Pamela Parker-Fine. The email was also forwarded to Hopkins.

38.     Fine removed EC from the classroom and called him into her office with Hopkins. This was the first meeting of that day with E.C. and administration.

39.     The meeting lasted only approximately five minutes. Fine and Hopkins merely informed EC that researching bullets in class was not "school appropriate behavior."

40.     During the meeting, EC informed Fine and Hopkins that over the previous weekend, he had gone to the shooting range with his mother to shoot guns, and that shooting guns was a family hobby.

41.     OCSD's Administrative Guideline Manual identifies "inappropriate access to, possession of, and use of firearms" as an "early warning sign of possible school violence."

42.     Fine and Hopkins allowed EC to return to class.

43.     After the meeting, Fine called EC's mother and left a voicemail notifying her of the incident.

44.     Pursuant to OCSD policy, Fine did not ask for or require a return phone call from EC's mother.

45.     EC's mother did not return the phone call

46.     Later on November 29th, EC posted to his publicly accessible Twitter account "Now I am become Death, the destroyer of worlds. See you tomorrow Oxford."

47.     On November 30, 2021, at approximately 8:30 am, teacher Allison Karpinski witnessed EC watching violent videos of shootings on his phone in class.

48.     Karpinski immediately emailed Hopkins to notify him of EC's conduct.

49.     At approximately 9:00 am, EC's math class was conducting a test review. EC drew a picture of a Sig Saur 9 mm handgun. Under the drawing of the gun he wrote "The thoughts won't stop. Help me." Next to the gun, EC drew a person with gunshot wounds in their abdomen and chest and blood coming out of their mouth. He wrote next to the person "blood everywhere" and drew a shell casing or bullet. EC also drew a laughing/crying emoji and wrote "my life is useless" and "the world is dead."

50.     Teacher Becky Morgan discovered the picture EC had drawn, took a photo of it and immediately reported it to Hopkins and Ejak.

51.     OCSD's Administrative Guideline Manual identifies "expression[s] of violence in writings and drawings" as an "early warning sign of possible school violence."

52.     At some point that morning, EC altered the picture he had drawn. He scratched out the gun, the gunshot victim, and the words "Help me," "my life is useless," "blood everywhere," and "the world is dead." EC added new, sarcastic

8

comments including "video game this is," "harmless act," "I love my life so much!!!!," "OHS rocks!," and "we're all friends here."

53. Around 9:00 am, Ejak went to Hopkins office to let him know he had seen the photos of EC's drawings and writings.

54. Hopkins went to EC's math class, removed EC from the classroom, and took him to the counseling office, where Ejak was waiting. Hopkins also removed EC's math assignment, containing the drawings and writings, from the classroom and brought them to the counseling office. EC's backpack remained in the math classroom.

55. Ejak returned to the math classroom and brought EC's backpack to the counseling office.

56. Neither Hopkins, nor Ejak, nor anyone else, at any point, searched EC's backpack, locker, or other possessions, to determine whether he had access to a gun or other weapon he could use to harm himself or others. Nor was EC asked whether he was in possession of or had access to a firearm or other weapon.

57. In the counseling office, Hopkins asked EC about the violent shooting video he had been watching in class that morning.

58. EC told Hopkins and Ejak that the video was from a video game.

59. Neither Hopkins nor Ejak endeavored to watch the video, or to confirm the accuracy of EC's response.

60. Hopkins questioned EC about the drawings and words on his math assignment.

61.     EC  told Hopkins that the drawings were images from a video game he wanted to design.

62.     Hopkins knew that EC was not being honest. Hopkins responded by saying "this does not sound like a video game."

63.     According to Hopkins, EC "became sad" and changed his demeanor. EC "started pausing more in his speech. He then described some [upsetting] things that had happened recently in his life."

64.     EC went on to tell Hopkins and Ejak about the recent death of a grandparent, recent death of a family dog, and the loss of a close friend who had recently moved to a different school

65.     OCSD's Administrative Guideline Manual identifies "excessive feelings of isolation and being alone" as an "early warning sign of possible school violence."

66.     According to Hopkins, at that point he determined that EC was suicidal.

67.     OCSD's Administrative Guideline Manual contains a Suicide Intervention Process which applies "any time a staff member encounters a situation in which a student appears to be contemplating suicide."

68.     Pursuant to the Suicide Intervention Process, staff members are required to "converse with the student immediately to determine if s/he has dangerous instrumentalities (weapon, substance, or other material capable of inflicting a mortal wound) on or nearby his/her person."

69.     Ejak and Hopkins never asked EC if he had a weapon on or nearby his person.

70.     Hopkins asked EC if he was a threat to himself or others.

71.     EC responded "I can see why this looks bad. I'm not going to do anything."

72.     Hopkins did not believe EC and concluded that he was a threat to himself "in spite of his statement."

73.     Where a student "is in imminent danger of harming himself" the Suicide Intervention Process requires the staff member to contact an outside agency "immediately, give them the facts, request them to intervene, and follow their instructions."

74.     If the agency declines to intervene before the end of the school day, the staff member is required to call the "emergency squad."

75.     Neither Ejak or Hopkins contacted any outside agencies. They did not request intervention by any outside agency and they did not contact the "emergency squad."

76.     Hopkins called EC's parents, received no answer, and left a voicemail for his mother.

77.     When EC's mother called back, Hopkins put the call on speaker, allowing Ejak and EC to hear the conversation.

78.     Hopkins told EC's mother that he was concerned about EC based on the drawings and writings EC made on his math assignment and on the conversation they had in the counseling office.

79.     Hopkins asked EC's mother to come to the school for a meeting. She replied that she was working but would try to get a hold of EC's father. She then called back and stated she would be there in thirty minutes.

80.     While they waited for EC's parents, Hopkins, believing EC to be a threat to himself and/or others, stayed in the counseling office with EC.

81.     EC's parents arrived around 10:30 am. They did not greet, touch, hug, or show affection towards EC upon arrival.

82.     Ejak returned to the counseling office for the meeting between himself, Hopkins, EC's parents and EC.

83.     During the meeting, Hopkins outlined EC's recent behavior, explained his concerns about EC and his conclusion that EC was suicidal.

84.     Hopkins advised EC's parents that EC needed to start counseling as soon as possible, "today, if possible."

85.     EC parents responded that starting counseling that day was not possible because they needed to return to work.

86.     Hopkins told EC's parents that they needed to provide EC with mental health treatment within 48 hours and that if they didn't, he would report them to Child Protective Services ("CPS").

87.     EC's parents refused to take their son home from school for the day.

88.     At the end of the meeting, EC's mother asked, "are we done?"

89.     Hopkins asked Ejak "if there was any disciplinary reason why [EC] could not return to class."

90.     Ejak responded "no."

91.     The Suicide Intervention Process directs that "under no circumstances is a suicidal student to be left alone."

92.     Hopkins and Ejak knew that the meeting had worsened EC's mental and emotional state.

93.     Hopkins and Ejak knew, based on Hopkins conversation with EC from the day before regarding the shooting range, that EC had access to firearms.

94.     Hopkins and Ejak knew that EC was obsessed with guns and gun violence, that he had been searching for bullets online, that he had been viewing violent videos of shootings.

95.     Both Hopkins and Ejak knew that EC had made drawings of guns, gun violence, and bloodied gunshot wound victims.

96.     Both Hopkins and Ejak knew or should have known, that EC was suicidal, posed a threat to himself and others, and should not be left unsupervised.

97.     Despite their knowledge of the threat EC posed and the need to supervise him, Hopkins and Ejak concealed these facts from teachers, staff and law enforcement.

98. Hopkins and Ejak had the authority to maintain EC in a safe, supervised environment, such as the counseling office, where he could be supervised.

99. Hopkins and Ejak also had the authority to search EC's backpack, locker, and other possessions, based on their assessment that EC was suicidal and the probable cause to think that EC was a danger to himself and others.

100. Hopkins and Ejak misused their authority by sending EC back to class, along with his unsearched backpack.

101. Because Hopkins knew that EC was a danger to himself and others, Hopkins tracked EC's attendance remotely throughout the day to ensure he made it to his other classes.

102. Less than two hours after being sent back to class by Ejak and Hopkins, EC went to the boys' bathroom with his backpack and emerged with his loaded handgun.

103. EC opened fire into the Oxford High School hallway.

104. Plaintiff suffered a "through and through" gunshot wound to the right shoulder. She suffered a spinal cord injury, a broken clavicle, and two broken ribs.

## CAUSES OF ACTION

### COUNT I
**State Created Danger (Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1983)**
*Against Defendants Ejak and Hopkins*

105. Plaintiff repeats and realleges the foregoing allegations.

14

106.    Under the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger.

107.    Plaintiff is a citizen of the United States and entitled to all rights, privileges, and immunities accorded to all citizens of the State of Michigan and of the United States, including the clearly established right under the Fourteenth Amendment, to be free from danger created and/or increased by Defendants, as enforced by 42 U.S.C. § 1983.

108.    Any reasonable person would be aware of this clearly established right.

109.    Ejak and Hopkins, acting with knowledge of this clearly established right but in deliberate indifference to it, violated Plaintiff's right to be free from state created and/or increased danger, as secured by the Fourteenth Amendment, by taking affirmative actions under the color of law which disrupted the status quo and created and/or increased the danger of violence to Plaintiff that did not exist in the status quo prior to Ejak and Hopkins' affirmative actions.

110.    Plaintiff's injuries would not have occurred but-for the affirmative actions of Ejak and Hopkins.

111.    At all relevant times, Ejak and Hopkins were acting under the color of state law as employees of Oxford Community School District, by, including and not limited to, supervising, advising, and directing EC's activities, implementing, exercising, and effectuating formal and informal school practices and procedures, and in their roles as school administrators and counselors.

15

112.  Ejak and Hopkins knew that EC was suicidal, experiencing extreme emotional distress, and that there was reasonable and sufficient cause to believe that EC's parents were abusing or neglecting him.

113.  Ejak and Hopkins further knew that EC was expressing specific, violent ideations involving firearms, was a danger to himself and others, including Plaintiff and other Oxford High School students, and that EC had access to firearms.

114.  Ejak and Hopkins had the authority and obligation to maintain the status quo in which EC was contained in the counseling office under direct supervision and without access to firearms to harm himself and/or others.

115.  Ejak and Hopkins used their authority to affirmatively release EC from the counseling office hand him his unsearched backpack, and to return him to the classroom despite their knowledge that EC was suicidal and posed a threat to himself and others.

116.  Ejak and Hopkins each took affirmative steps, either individually or in concert with one another, which created and/or substantially increased the danger that EC would escalate to actual violence, causing harm to Plaintiff.

117.  Ejak and Hopkins engaged in affirmative acts which created or greatly increased the risk of danger to Plaintiff including but not limited to:

   a.  releasing EC from the secure, supervised confines of the counseling office despite knowing, or having probable cause to know, that EC was suicidal and posed a threat to himself and others;

16

b.   returning to EC with his unsearched backpack containing a handgun and ammunition, despite knowing, or having probable cause to know, that EC was suicidal, had recently used a gun at a shooting range, and posed a threat to himself and others;

c.   promoting a policy, practice, and/or custom of concealing, misrepresenting, minimizing, avoiding, and/or non-escalation of suspected or known risks of school violence and school shootings; and

d.   any and all additional affirmative acts that created and/or increased the danger of violence at Oxford High School that may become known throughout the course of this litigation.

118.   Ejak and Hopkins' affirmative actions, set forth throughout, created and/or increased a state-created danger that substantially increased the special danger of harm to Plaintiff and her peers at Oxford High School, and in doing so knowingly and recklessly disregarded the substantial risk of danger that EC posed to himself and others.

119.   The relationship between Ejak and Hopkins, as school administrators, and the students of Oxford High School, including Plaintiff, was such that Ejak and Hopkins knew any student, including Plaintiff, was a foreseeable victim of EC's acts of violence following his release from the security and supervision of the counseling office by Ejak and Hopkins.

120. Ejak and Hopkins are not entitled to qualified immunity because Plaintiff's right to be free from state created and/or increased danger was clearly established at the time of Ejak and Hopkins' actions.

121. The conduct of Ejak and Hopkins was objectively unreasonable, performed knowingly and with deliberate indifference to the safety and rights of Oxford High School staff and students, including Plaintiff, and caused Oxford High School staff and students, including Plaintiff to be less safe than they were before Ejak and Hopkins' affirmative actions.

122. Ejak and Hopkins knew that their conduct and affirmative actions, which created and/or increased the risk of a school shooting, violated the clearly established rights of Oxford High School students, including Plaintiff.

123. Ejak and Hopkins had ample time to deliberate as to whether to release EC, with his unsearched backpack, whom they knew to be suicidal and posed a threat to himself and others, from the security and supervision of the counseling office to the school environment.

124. Ejak and Hopkins consciously disregarded the substantial risk of danger by releasing EC, whom they knew to be suicidal and posed a threat to himself and others, from the security and supervision of the counseling office to the school environment.

125. Plaintiff, as an Oxford High School student, was in a custodial or semi-custodial relationship with OCSD and its staff, including Ejak and Hopkins, such that

Ejak and Hopkins' deliberate indifference to the known risk of danger posed by EC shocks the conscience.

126.   Ejak and Hopkins' affirmative actions—releasing EC from the security and supervision of the counseling office in a suicidal state—served no legitimate countervailing or mandatory duty.

127.   But for the affirmative actions of Ejak and Hopkins to change the status quo by releasing EC, in a suicidal state, from the security and supervision of the counseling office, with his unsearched backpack containing a handgun and ammunition, EC would not have shot, injured, or killed anyone at Oxford High School, including Plaintiff.

128.   But for Ejak and Hopkins affirmative actions, releasing EC from the security and supervision of the counseling office, the status quo of safety would have remained.

129.   Ejak and Hopkins' actions affirmatively created new dangers that did not exist so long as EC remained in the security and supervision of the counseling office, separated from his backpack, and affirmatively increased dangers that did not exist so long as the status quo remained.

130.   It is shocking to the conscience that Ejak and Hopkins would release EC from the security and supervision of the counseling office and return him to the school environment where they knew: that EC was suicidal, that EC had an obsession with firearms and gun violence, that EC had been researching ammunition at school the day

before, that EC had been watching violent videos of shootings at school earlier that day, that EC had drawn disturbing and violent images and words depicting gun violence and his mental disturbances, that EC was suicidal, that EC's parents were informed of EC's suicidal ideations and refused to take him for treatment, that EC was a threat to himself and others, that EC had access to firearms, and that they had the authority and obligation to keep EC away from the school environment.

131.    In comparison to the public at large, as a student of Oxford High School, Plaintiff was specifically at risk and exposed to the dangers presented by the affirmative actions of Ejak and Hopkins, including releasing EC from the security and supervision of the counseling office to the school environment, where EC committed the school shooting.

132.    As a result of their affirmative actions, Ejak and Hopkins deprived Plaintiff of her rights secured by the Fourteenth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983.

133.    As a direct and foreseeable consequence of Ejak and Hopkins' affirmative actions, Plaintiff was deprived of her rights under the Fourteenth Amendment to the U.S. Constitution and thereby suffered injuries and damages.

**<u>COUNT II</u>**
**42 U.S.C. § 1983—Supervisory Liability**
*Against Defendants Throne and Wolf*

134.    Plaintiff repeats and realleges the foregoing paragraphs.

20

135.    As set forth above, the affirmative actions of Ejak and Hopkins violated Plaintiff's clearly established constitutional rights.

136.    At all times relevant herein, Defendant Throne was the Superintendent of Oxford Community School District and therefore responsible for supervising and overseeing the actions of Defendants Wolf, Ejak, and Hopkins.

137.   Throne encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, or providing proper supervision for EC, by adopting a policy, practice, and/or custom of not informing local law enforcement of the risk of danger to Oxford High School students and staff, and by discouraging students, parents, and staff from reporting suspected threats to the safety and security of students and staff.

138.    At all times relevant herein, Defendant Wolf was the Principal of Oxford High School and therefore responsible for supervising and overseeing the actions of Defendants Ejak and Hopkins.

139.   Wolf encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, removing or providing proper supervision for EC; calling Child Protective Services, Law Enforcement or school security, and  by adopting a policy, practice, and/or custom of not informing local law enforcement of the risk of danger to Oxford High School students and staff, and by discouraging students, parents, and staff from reporting suspected threats to the safety and security of students and staff.

140.    By not expelling, disciplining, removing or providing proper supervision for EC, Throne and Wolf authorized, approved, or knowingly acquiesced in Ejak and Hopkins' unconstitutional conduct.

141.    By adopting a policy, practice, and/or custom of not informing local law enforcement of the risk of danger to Oxford High School students and staff, Throne and Wolf authorized, approved, or knowingly acquiesced in Ejak and Hopkins' unconstitutional conduct.

142.    By discouraging students, parents, and staff from reporting suspected threats to the safety and security of students and staff, Throne and Wolf authorized, approved, or knowingly acquiesced in Ejak and Hopkins' unconstitutional conduct.

143.    At all relevant times, Plaintiff had the clearly established right under the Fourteenth Amendment, to be free from danger created and/or increased by Defendants.

144.    As set forth above, Ejak and Hopkins violated Plaintiff's clearly established to be free from danger created and/or increased by Defendants.

145.    Throne and Wolf at least implicitly authorized, approved, or knowingly acquiesced in Ejak and Hopkins unconstitutional acts.

146.    Throne and Wolf acted in reckless disregard and deliberate indifference to Plaintiff's constitutional right to be free from danger created and/or increased by Defendants.

147. Throne and Wolf are not entitled to qualified immunity because the right to be free from state created and/or increased danger was clearly established at the time of their actions and/or omissions.

**COUNT III**
**42 U.S.C. § 1983—*Monell* Liability**
***Against Defendant Oxford Community School District***

148. Plaintiff repeats and realleges the foregoing paragraphs.

149. Defendants Oxford Community School District and its administrators, and policy makers, including Defendants Throne, Wolf, and Ejak, adopted and maintained official policies, practices, and customs that were the moving force behind, and cause-in-fact, of the school shooting and injury to Plaintiff on November 30, 2021.

150. The violation of Plaintiff's Fourteenth Amendment rights resulted from the execution of Oxford Community School District's practices, unwritten policies, and customs.

151. These policies, practices, and customs include, but are not limited to:

a. an official policy, practice, and/or custom of preventing staff and administrators from maintaining supervision over students in the counseling office and restricting students from returning to the classroom, unless there is a "disciplinary" reason to justify doing so, even where the student is suicidal and/or a danger to others;

b.  a policy, practice, and/or custom of concealment, misrepresentation, minimizing, avoiding, and non-escalation to high authorities of suspected or known risks of school violence;

c.  a policy, practice, and/or custom of not training staff and administrators to secure and/or supervise students who are suicidal and/or pose a threat of harm to themselves or others;

d.  a policy, practice, and/or custom of not training staff and administrators to properly interview and question students who are suicidal as to whether the student has access to a deadly weapon, including a firearm;

e.  a policy, practice, and/or custom of not training in proper methods of risk assessment;

f.  a policy, practice, and/or custom of disregarding, minimizing, avoiding, and of non-escalation of potential threats to the safety and security of staff and students;

g.  a policy, practice, and/or custom of discouraging students, parents, and staff from reporting suspected threats to the safety and security of staff and students;

h.  a policy, practice, and/or custom of declining to file mandatory reports of suspected child abuse or neglect in violation of MCL 722.623;

    i.    a policy, practice, and/or custom of discouraging teachers, counselors, administrators, and other staff from reporting suspected child abuse or neglect despite their status as mandatory reporters;

    j.    a policy, practice, and/or custom of not searching students' backpacks, lockers, or other possessions where the student poses a threat of harm to himself and/or others; and

    k.    any other policy, practice, or custom that may become known through the course of this litigation.

152. These policies, practices, and customs caused Oxford Community School District employees to inflict constitutional harms by directly creating and/or increasing that danger that Plaintiff would be injured in the November 30, 2021 school shooting.

153. Oxford Community School District maintains the aforementioned customs or practices with intentional, deliberate indifference to the widespread custom or usage of constitutional violations.

154. Oxford Community School District's failure to properly train, supervise, and/or disciplined its employees amounts to deliberate indifference to the students', including Plaintiff's, constitutional rights.

155. As a direct and proximate result of Oxford Community School District's policies, practices, and customs, as stated herein, Plaintiff's Fourteenth Amendment rights were violated.

## COUNT IV
### Michigan Child Protection Law (MCL 722.621 *et seq.*)
### *Against Defendants Oxford Community School District, Ejak, and Hopkins*

156.     Plaintiff repeats and realleges the foregoing paragraphs.

157.     The Michigan Child Protection Law requires certain individuals, including school administrators and counselors, who have reasonable cause to suspect child abuse or neglect to report that abuse or neglect. MCL 722.623(1).

158.     One who fails to report suspected child abuse or neglect, as required by the statute, is civilly liable for the damages proximately caused by the failure. MCL 722.633(1).

159.     Pursuant to MCL 722.623(1), Ejak and Hopkins were mandatory reporters, required by statute to report suspected child abuse or neglect.

160.     Ejak and Hopkins had reasonable cause to believe that EC was being abused or neglected by his parents.

161.     Specifically, Ejak and Hopkins knew that EC was suicidal, informed EC's parents that EC was suicidal and needed immediate mental health treatment, knew that EC parents refused to provide their suicidal child with immediate mental health treatment, and knew that EC's parents effectively abandoned him at school.

162.     Ejak and Hopkins knew that the failure to provide EC with mental health treatment warranted making a report to CPS.

163.     Ejak and Hopkins acted with gross negligence by failing to report the suspected child abuse or neglect of EC.

164.     Ejak and Hopkins' failure to report was so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

165.     Ejak and Hopkins' failure to report was a proximate cause of Plaintiff's injuries and damages.

166.     Defendant Oxford Community School District, as an employer, is vicariously liable for the actions of its employees and agents, including Ejak and Hopkins' failure to report suspected child abuse or neglect.

## COUNT V
### Gross Negligence
### *Against Defendants Throne, Wolf, Ejak and Hopkins*

167.     Plaintiff repeats and realleges the foregoing paragraphs.

168.     Gross negligence occurs where there is a duty, and a breach of that duty by conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results, causing injury.

169.     Defendants had a duty to refrain from taking actions that were so reckless as to demonstrate a substantial lack of concern for whether an injury results, thereby causing injury.

170.     In deliberate breach of their duties, Throne and Wolf concealed and minimized the known risk of harm to Oxford High School students, and affirmatively discouraged students, parents, and staff from reporting threats to the security and safety of students and staff.

171.     In deliberate breach of their duties, Throne, Wolf, Ejak, and Hopkins failed to intervene despite having knowledge that EC was suicidal, experiencing extreme emotional distress, and crying out for help.

172.     In deliberate breach of their duties, Ejak and Hopkins released EC from the safety and supervision of the counseling office despite their knowledge that EC was suicidal and posed a threat to himself and others, thus placing Plaintiff in harm's way.

173.     In deliberate breach of their duties, Ejak and Hopkins failed to take any steps, including searching EC's backpack, locker, or other possessions, to ensure that EC did not have access to firearms or other weapons with which to harm himself or others, thus placing Plaintiff in harm's way.

174.     All of the aforementioned breaches of duty were so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and were the cause of the November 30th shooting in which Plaintiff was injured.

175.     Defendants' actions and omissions were grossly negligent and proximately caused Plaintiff's injuries because Defendants' actions and omissions directly placed Plaintiff in harm's way, provided EC with access to the handgun he used to injure Plaintiff, and caused EC to escalate his behavior from violent ideations to violent conduct.

176.     As a direct and proximate result of Defendants' actions, Plaintiff suffered injuries including gunshot wounds and emotional distress.

## COUNT VI
### Violation of Article 1, § 17 of the 1963 Michigan Constitution
### *Against Defendants Throne, Wolf, Ejak, Hopkins, and Oxford Community School District*

177.     Plaintiff repeats and realleges the foregoing paragraphs.

178.     Plaintiff, as a United States citizen and citizen of the State of Michigan, pursuant to Article 1 § 17 of the Michigan Constitution, had a clearly established right to bodily integrity and to be free from danger created and/or increased by Defendants.

179.     As set forth above, Ejak and Hopkins violated Plaintiff's clearly established constitutional rights by taking affirmative actions which created and/or increased the risk to Plaintiff of violence by a third party.

180.     As compared to the public at large, Defendants' affirmative actions placed Plaintiff, as an Oxford High School student, in special danger.

181.     Ejak and Hopkins knew or should have known that their actions specifically endangered Plaintiff, as an Oxford High School student.

182.     Ejak and Hopkins knew that releasing EC from the security and supervision of the counseling office in a suicidal state posed an excessive risk to Plaintiff's health and safety.

183.     Ejak and Hopkins deliberately disregarded the excessive risk to Plaintiff's health and safety, created by Defendants' affirmative actions to release EC from the security and supervision of the counseling office in a suicidal state.

184.     It is shocking to the conscience that Ejak and Hopkins would release EC from the security and supervision of the counseling office and return him to the school environment where they knew: that EC was suicidal, that EC had an obsession with firearms and gun violence, that EC had been researching ammunition at school the day before, that EC had been watching violent videos of shootings at school earlier that day, that EC had drawn disturbing and violent images and words depicting gun violence and his mental disturbances, that EC was suicidal, that EC's parents were informed of EC's suicidal ideations and refused to take him for treatment, that EC was a threat to himself and others, that EC had access to firearms, and that they had the authority and obligation to keep EC away from the school environment.

185.     At all times relevant herein, Ejak and Hopkins were acting under the color of state law and by way of their actions, created and/or increased danger to Plaintiff, in reckless disregard to Plaintiff's clearly established rights and the increased risk of danger to Plaintiff.

186.     As a result of their affirmative actions, Ejak and Hopkins deprived Plaintiff of her clearly established rights secured by Article 1 § 17 of the Michigan Constitution.

187.     As a direct and foreseeable consequence of Ejak and Hopkins' affirmative actions, Plaintiff was deprived of her rights under Article 1 § 17 of the Michigan Constitution and thereby suffered injuries and damages, including but not limited to past and future medical expenses, emotional distress, and mental anguish.

WHEREFORE as a result of Defendants' conduct, Plaintiff has incurred injuries and damages, including but not limited to past and future medical expenses, emotional distress, physical and emotional pain and suffering, fright and shock, loss of earning capacity, reasonable expenses for caretaking, mental health services and emotional support dog, and the loss of the ordinary pleasures of life.

## RELIEF REQUESTED

Plaintiff respectfully requests that the Court grants the following relief:

**A.    Legal Relief:**

1. Past and future compensatory emotional distress damages in whatever amount she is found to be entitled;

2. Future Economic damages in whatever amount she is found to be entitled;

3. Past and damages for medical expenses in whatever amount she is found to be entitled;

4. Exemplary and punitive damages in whatever amount she is found to be entitled;

5. An award of interest, costs, reasonable attorney fees, and expert witness fees.

**B.    Equitable Relief:**

1. An injunction from this Court prohibiting any further acts of wrongdoing against Plaintiff;

2. An award of interest, costs, and reasonable attorney fees; and,

3. Whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  June 7, 2022

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
*Attorneys for Plaintiff*
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com

## JURY DEMAND

Plaintiff Kylie Ossege, by and through her attorneys, Deborah Gordon Law, demands a trial by jury of all the issues in this cause that are so triable.

Dated:  June 7, 2022

**DEBORAH GORDON LAW**
/s/Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
*Attorneys for Plaintiff*
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com